UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 19-60131-CR-ALTMAN

**UNITED STATES**,

*v.*

**GIOVANNI ALMEYDA LONERGAN**,

    *Defendant.*

_____/

## ORDER

Giovanni Almeyda Lonergan—a convicted child sex offender who suffers from asthma and obesity—asks for compassionate release because of the COVID-19 pandemic. *See* Motion for Compassionate Release [ECF No. 80].[1] We deny his Motion for three reasons. *First*, he's failed to substantiate his claim that "extraordinary and compelling circumstances" justify his release. *Second*, the § 3553(a) factors weigh heavily against a reduction. *Third*, he's failed to show that he's no longer a danger to the community.

## THE FACTS

Giovanni Almeyda Lonergan is 36 years old. *See* Sentencing Memorandum [ECF No. 37] at 9 ("Giovanni Almeyda Lonergan was born on January 16, 1986 in San Juan, Puerto Rico."). In 2019, Lonergan pled guilty to one count of a federal indictment, which charged him with possession of child

---

[1] When the Government failed to file a timely response, Lonergan asked us to grant his motion by default. *See* Motion for Default [ECF No. 82]. We denied that motion. *See* Order Denying Default [ECF No. 83]. As we explained there, our Local Rules provide that "each party opposing a motion shall file and serve an opposing memorandum of law no later than fourteen (14) days after service of the motion" and that '[f]ailure to do so *may* be deemed sufficient cause for granting the motion by default." S.D. FLA. L.R. 7.1(c) (emphasis added). But we found "that the Government's delay in responding is not 'sufficient cause' to grant the motion by default" and that Lonergan had "pointed to no decision granting a motion for compassionate release by default." Order Denying Default.

pornography.² *See* Plea Agreement [ECF No. 26] at 1; Factual Proffer [ECF No. 28] at 1–2. In doing so, Lonergan conceded that he possessed over 200 images and videos of child pornography on his iPad. *See* Presentence Investigation Report ("PSI") [ECF No. 36] at 6–7. Lonergan admitted to knowing that the children, some of whom were under the age of 12, were minors. *Id.* at 8. The PSI also noted that Lonergan's iPad contained a video of "Lonergan taping women and young girls in public, focusing on their buttocks and the back of their thighs." *Id.* at 7. On January 2, 2020, Judge Robert N. Scola sentenced Lonergan, a first-time offender, to 48 months in prison. *See* Judgment [ECF No. 42]. Lonergan didn't appeal his conviction. *See generally* Docket.

Lonergan says that he's served over 50% of his sentence and that his projected release date is "within the next 5 months." Motion at 2. The Government, for its part, contends that Lonergan has a projected release date of March 4, 2023. *See* Response [ECF No. 84] at 5. The Government's position is corroborated by the BOP's own timetable. *See* BUREAU OF PRISONS INMATE LOOKUP, *bop.gov/inmateloc* (last visited Feb. 9, 2022) (showing a "[r]elease date of March 04, 2023"). Lonergan thus has about 13 months—or 27%—of his sentence remaining. Either way, Lonergan asks us to void the rest of his sentence and to release him immediately because he suffers from a few medical conditions that (he says) put him at greater risk of serious injury or death if he were to contract COVID-19. *See* Motion at 1–3. Specifically, Lonergan claims that he (1) is obese, (2) needs oral surgery, (3) has asthma and a compromised immune system, and (4) is Hispanic. *Id.* He says that these factors combine to "cause a severely disproportionate increase in risk of severe illness and or death if he were to contract C[OVID]-19." *Id.* at 2–3.

---

² Lonergan was also charged with transporting child pornography—a charge that was dropped as part of Lonergan's plea agreement. *See* Indictment [ECF No. 7]; Plea Agreement [ECF No. 26].

**ANALYSIS**

Section 3582 sets out the order in which we must analyze a defendant's entitlement to a sentencing reduction. *First*, when the defendant brings the motion himself, we must ascertain whether he "has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or [whether there has been a] lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." 18 U.S.C. § 3582(c)(1)(a). *Second*, we must "consider[] the factors set forth in section 3553(a) to the extent that they are applicable." *Id. Third*, we should turn to the "extraordinary and compelling reasons" test, as outlined in U.S.S.G. § 1B1.13 cmt. n.1. And *fourth*, we should determine whether the defendant poses a "danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)." *Id.*; *see also United States v. Stuyvesant*, 454 F. Supp. 3d 1236, 1238 (S.D. Fla. 2020) (applying this four-part framework). We discuss each of these steps in turn.

**I.      Exhaustion of Administrative Rights to Appeal**

The Government concedes that the BOP denied Lonergan's request for compassionate release. *See* Response at 4. Since Lonergan has exhausted his administrative remedies, we're free to consider the merits of his Motion.

**II.     18 U.S.C. § 3553(a)**

After considering the relevant § 3553(a) factors, Judge Scola sentenced Lonergan to 48 months in prison. *See* Judgment. Lonergan didn't appeal this sentence. *See* Docket. In his Motion, Lonergan offers four arguments under § 3553(a). *First*, he says that he was convicted of a non-violent crime and claims that he "has undergone an extensive psychological evaluation as part of his treatment and rehabilitation efforts." Motion at 25. *Second*, he says that he's "been a model prisoner during the totality of his incarceration term" and insists that his conduct while in prison "demonstrat[es] superior efforts of rehabilitation"—especially given that he "quickly accepted complete responsibility for his

3

conduct[.]" *Id.* at 22–26. *Third*, he maintains that, if released, his status as a supervised releasee will prevent him from committing future crimes. *Id.* at 9. *Fourth*, he promises to live with his sister who, as "an [o]fficer of the [c]ourt, is willing and able to accept provisional responsibility and custodial supervision . . . [and] will care for his medical needs." *Id.*

But Judge Scola already considered Lonergan's history and characteristics and his early acceptance of responsibility when he handed Lonergan the sentence he is now serving. And we aren't persuaded that Lonergan's behavior while incarcerated, his status as a supervised releasee, or his decision to live with his sister justify any reduction. To understand why, let's review the § 3553(a) factors. The first factor—the "nature and circumstances of the offense," § 3553(a)(1)—weighs strongly against early release. Lonergan, after all, possessed over 200 images of child pornography— many of these involving minors under the age of 12. *See* PSI at 6–7. We don't think we're going out on a limb by characterizing this conduct as extremely disturbing and very serious. And it ignores reality to refer to these crimes as non-violent. Lonergan, it's true, may not have participated in the vile acts he enjoyed perusing. But, by viewing the visual depictions of those acts, he unquestionably served as an important appendage of the insatiable beast those acts were intended to feed. He, in short (and others like him), created the market that chews up and digests the most humiliating and painful events of these abused children's lives. And for that—if for nothing else—he must be punished. *Cf.* Amy, Vicky, and Andy Child Pornography Victim Assistance Act of 2018, Pub. L. 115-299, § 2(2), 132 Stat. 4383, 4383 (2018) ("The harms caused by child pornography begin, but do not end, with child sex assault because child pornography is a permanent record of that abuse and trafficking in those images compounds the harm to the child."); Adam Walsh Child Protection and Safety Act of 2006, Pub. L. 109-248, § 501(1)(A), 120 Stat. 587, 623 (2006) ("The illegal production, transportation, distribution, receipt, advertising and possession of child pornography . . . is harmful to the physiological, emotional,

4

and mental health of the children depicted in child pornography and has a substantial and detrimental effect on society as a whole.").

The second factor—Lonergan's "history and characteristics," § 3553(a)(1)—cuts both ways. On the one hand, Lonergan is right to rely on the results of his psychosexual evaluations and on what seem like genuine efforts at rehabilitation. *See* Motion at 25. And it may well be true that Lonergan has been something of a model inmate during his incarceration. *See id.* at 25–26 (completing "more [than] 400 hours of classroom programing," conducting "correspondence learning courses," "tutor[ing] a great number of fellow inmates," and taking on the role of "Head Unit Orderly" at his facility). At the same time, given that Judge Scola already considered many of these factors at sentencing—*i.e.*, the results of his psychosexual evaluations, his clean criminal record, his early acceptance of responsibility, and his efforts at rehabilitation, *see* Sentencing Transcript at 4–5, 8 [ECF No. 40]—we're not sure it'd be appropriate to use *these same facts* to cut his sentence now. We commend Lonergan, of course, for his good conduct while in prison. But there's only so much we can infer from that behavior. That's because, unlike a violent felon (who can continue to act violently while in custody), the BOP has stripped Lonergan of the very mechanism he used to commit his crimes. Lonergan's Internet access is, after all, strictly limited these days. And, it goes without saying, these strict limitations prevent him from viewing child pornography. So, it isn't quite fair to say that Lonergan's spotless conduct while in prison reveals some magical reformation in his proclivities because he simply cannot, in this setting, commit the only crime he's ever shown any interest in.

Most of the remaining factors—the need for the sentence imposed to "reflect the seriousness of the offense," to "promote respect for the law," to "provide just punishment for the offense," to "afford adequate deterrence," and to "protect the public from further crimes of the defendant," § 3553(a)(2)—militate heavily against release. As we've suggested, Lonergan engaged in repeated acts of disturbing, anti-social, and extremely harmful criminal conduct. And it's important for federal judges

5

to stand up for the most vulnerable victims in our society—to say, in effect, that this sort of conduct is (and ought to be) subject to a not-insubstantial degree of moral and social opprobrium and that, if you are caught and convicted, you will be severely punished.

Lonergan, in short, asks us to forget about the gravity of his crimes and, guided by that amnesia, to cut out the remainder of his sentence. *See generally* Motion. This we will not do. To release Lonergan now—just over halfway through his sentence—would send precisely the *wrong* message: that child-pornography crimes aren't serious, that the dangers sex offenders pose are overblown, and that the penalties we've set out in our criminal laws needn't be strictly followed. Releasing Lonergan, in other words, would decrease, rather than increase, the citizenry's respect for the law.

The § 3553(a) factors thus weigh strongly against early release.

### III.     18 U.S.C. § 3582

District Courts have "no inherent authority" to modify a prison sentence. *United States v. Diaz-Clark*, 292 F.3d 1310, 1315, 1319 (11th Cir. 2002). Instead, the "authority of a district court to modify an imprisonment sentence is narrowly limited by statute." *United States v. Phillips*, 597 F.3d 1190, 1194–95 (11th Cir. 2010). The statute that governs sentencing reductions for compassionate medical release provides, in pertinent part, as follows:

> **(c) Modification of an imposed term of imprisonment.**--The court may not modify a term of imprisonment once it has been imposed except that—
>
> (1) in any case—
>
> (A) the court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that—
>
>   (i)    extraordinary and compelling reasons warrant such a reduction; or

> (ii) the defendant is at least 70 years of age, has served at least 30 years in prison, pursuant to a sentence imposed under section 3559(c), for the offense or offenses for which the defendant is currently imprisoned, and a determination has been made by the Director of the Bureau of Prisons that the defendant is not a danger to the safety of any other person or the community, as provided under section 3142(g); and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission; and
>
> (B) the court may modify an imposed term of imprisonment to the extent otherwise expressly permitted by statute or by Rule 35 of the Federal Rules of Criminal Procedure; and

18 U.S.C. § 3582(c)(1).

Because Lonergan is not "at least 70 years of age," he does not qualify for release under § 3582(c)(1)(A)(ii). The viability of his request thus turns on the "extraordinary and compelling reasons" test set out in § 3582(c)(1)(A)(i). But Section 3582 never describes the kinds of "[e]xtraordinary and compelling reasons" that might "warrant a reduction." Under 28 U.S.C. § 994, however, the United States Sentencing Commission (the "Commission") is authorized to "describe what should be considered extraordinary and compelling reasons for sentence reduction [under § 3582]." 28 U.S.C. § 994(t). And the Commission has helpfully defined the contours of the applicable test as follows:

> 1. **Extraordinary and Compelling Reasons.**--Provided the defendant meets the requirements of subdivision (2), extraordinary and compelling reasons exist under any of the circumstances set forth below:
>
> **(A) Medical Condition of the Defendant.**
>
> (i) The defendant is suffering from a terminal illness (i.e., a serious and advanced illness with an end of life trajectory). A specific prognosis of life expectancy (i.e., a probability of death within a specific time period) is not required. Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia.
>
> (ii) The defendant is
>
>     (I) suffering from a serious physical or medical condition,
>
>     (II) suffering from a serious functional or cognitive impairment, or

7

>> (III) experiencing deteriorating physical or mental health because of the aging process,
>
>> that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.
>
> **(B) Age of the Defendant.--**The defendant (i) is at least 65 years old; (ii) is experiencing a serious deterioration in physical or mental health because of the aging process; and (iii) has served at least 10 years or 75 percent of his or her term of imprisonment, whichever is less.

U.S.S.G. § 1B1.13 cmt n.1.

The reference to "subdivision (2)" requires Lonergan to show that he is "not a danger to the safety of any other person or to the community." U.S.S.G. § 1B1.13(2). And § 3142(g), in turn, instructs federal courts to consider the following factors when assessing whether a defendant poses a danger to the safety of any other person or the community:

> **(g) Factors to be considered.--**The judicial officer shall, in determining whether there are conditions of release that will reasonably assure the appearance of the person as required and the safety of any other person and the community, take into account the available information concerning—
>
> (1) the nature and circumstances of the offense charged, including whether the offense is a crime of violence, a violation of section 1591, a Federal crime of terrorism, or involves a minor victim or a controlled substance, firearm, explosive, or destructive device;
>
> (2) the weight of the evidence against the person;
>
> (3) the history and characteristics of the person, including—
>
>> (A) the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and
>
>> (B) whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law; and
>
> (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release. In considering the conditions of release described in subsection (c)(1)(B)(xi) or (c)(1)(B)(xii) of this section, the judicial officer

may upon his own motion, or shall upon the motion of the Government, conduct an inquiry into the source of the property to be designated for potential forfeiture or offered as collateral to secure a bond, and shall decline to accept the designation, or the use as collateral, of property that, because of its source, will not reasonably assure the appearance of the person as required.

Lonergan bears the burden of establishing both that his circumstances qualify as "extraordinary and compelling reasons" and that he no longer presents a danger to any other person or the community. *See United States v. Hamilton*, 715 F.3d 328, 337 (11th Cir. 2013) (noting that "a defendant, as the § 3582(c)(2) movant, bears the burden of establishing" that compassionate release is warranted); *Cannon v. United States*, 2019 WL 5580233, at *2 (S.D. Ala. Oct. 29, 2019) ("[T]he defendant has the burden to show circumstances meeting the test for compassionate release."); *United States v. Heromin*, 2019 WL 2411311, at *2 (M.D. Fla. June 7, 2019) ("[The defendant] bears the burden of establishing that compassionate release is warranted.").

As a preliminary matter, Lonergan cannot satisfy the "Age of the Defendant" test because he is 36 years old, not 65, and has not alleged any age-related decline. His request for relief, then, hinges on his ability to meet either of the two elements of the "Medical Condition of the Defendant" test. The first element requires him to show that he suffers from a "terminal illness." U.S.S.G. § 1B1.13 cmt n.1(1)(A)(i). The second requires him to establish that he suffers from any of three conditions "that substantially diminishes [his] ability . . . to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover." U.S.S.G. § 1B1.13 cmt n.1(1)(A)(ii).

Lonergan points to four things that (in his view) "cause a severely disproportionate increase in risk of severe illness and or death if he were to contract C[OVID]-19." Motion at 1–2. *First*, he characterizes himself as obese. *Id* at 5. *Second*, he points to an oral infection that requires surgery. *Id.* at 10. *Third*, he claims to suffer from asthma and a compromised immune system. *Id* at 7, 12. *Fourth*, he says that he's Hispanic and that, as a person of color, he's at a disproportionally higher risk of suffering

9

from COVID-19 complications.[3] *Id* at 9.[4] But these conditions—even taken together—don't create the kinds of "extraordinary and compelling" circumstances that would entitle Lonergan to relief.

That's because Lonergan is being housed at FCI Jesup, *see id.* at 2, where (as of this writing) only *eight* inmates (out of a total population of 1,431) and *zero* staff have active COVID-19, *see BOP: COVID-19 Cases*, FEDERAL BUREAU OF PRISONS, https://www.bop.gov/coronavirus/ (last visited Feb. 9, 2022). And the BOP has implemented some rather severe operating procedures, which—as the preceding figure makes clear—have been extremely effective at preventing infections. *See* Response at 6–8 (citing the BOP's Modified Operating Procedures). As for his asthma, Lonergan concedes that the BOP has provided him with adequate medication and that, as a result, his "[oxygen] levels have consistently been normal." Motion at 7–8. Most importantly, Lonergan has been fully vaccinated against COVID-19 (as have three-fourths of FCI Jesup's inmate population). *Id.* at 2 ("[T]he Defendant has received two (2) doses of the Moderna Vaccine."); Response at 9 (noting the vaccination rate at FCI Jesup). Lonergan, then, has little to fear from COVID-19.

Putting all of that aside, we're not convinced that the pandemic justifies Lonergan's immediate release anyway. *See, e.g.*, *United States v. De Leon,* 2021 WL 3478372, at *3 (11th Cir. Aug. 9, 2021) (affirming the district court's denial of a prisoner's compassionate-release motion because obesity "[as

---

[3] For this proposition, Lonergan relies on a Brookings blog post from June 2020 titled "Race gaps in COVID-19 deaths are even bigger than they appear" and a CDC article titled "Health Equality Considerations and Racial and Ethnic Minority Groups." *See* Motion at 9. But neither article suggested that the virus targets Hispanic people more aggressively than it does, say, whites. They simply pointed out that, for a variety of socio-economic reasons, members of minority groups are more likely to contract (and thus die from) COVID-19. That seems logical enough. Neither article, however, supports Longeran's view that he should be treated differently than other inmates solely *because of* his race. After all, the likelihood that Lonergan will contract COVID-19 (or receive adequate BOP healthcare) while he's incarcerated is identical to that of all the other BOP inmates at his facility—irrespective of race.

[4] Lonergan also claims to have costochondritis, irritable bowel syndrome, and Hyaline Membrane Disease (Pulmonary Distress Syndrome). *See* Motion at 1. But he doesn't suggest that these conditions place him at a higher risk of severe complications from COVID-19. *See generally id.*; *see generally* Reply.

10

a] medical problem[ ] do[es] not establish eligibility for a reduced sentence, even in light of the COVID-19 pandemic"); *United States v. Morrow,* 2021 WL 3629822, at *2 (11th Cir. Aug. 17, 2021) (affirming the district court's determination that a prisoner's asthma "does not mandate a finding of an extraordinary and compelling reason under section 1B1.13"); *United States v. Thomas*, 2020 WL 4734913, at *2 (M.D. Fla. Aug. 14, 2020) (denying compassionate release after considering the defendant's medical conditions—including a compromised immune system—and concluding that those conditions didn't "substantially diminish [the defendant's] ability . . . to provide self-care within the environment of a correctional facility"); *United States v. Julian,* 2021 WL 1966516, at *1–3 (M.D. Fla. May 17, 2021) (denying compassionate release because the justifications the defendant offered for his release—principally, his age, race, and heart condition—"are not encompassed within the 'extraordinary and compelling' circumstances in the policy statement").

Lonergan also says that he's suffering from an oral infection that "causes both a higher risk to C[OVID]-19 and may also and independently lead to the death of the Defendant even without contracting the virus." Motion at 10. But "nothing in [the] *medical records*" relating to his oral infection "indicates that he is suffering from a terminal illness or that his [oral infection] substantially diminish[es] his ability to provide self-care within the environment of a correctional facility and from which he is not expected to recover." *United States v. Johnson*, 2020 WL 6134668, at *2 (M.D. Fla. Oct. 19, 2020) (cleaned up & emphasis added). To the contrary, Lonergan's medical records indicate that he needs some "routine" oral surgery to treat "[i]ntermittent pain" from a prior "root canal therapy." Oral Surgical Documents [ECF No. 80-9] at 8. Lonergan, in fact, has apparently experienced this same "[i]ntermittent pain" for over "two years"—all without, as far as we can tell, any serious complication. *Id.* Nor has Lonergan shown that the BOP is unable to treat him. The BOP, after all, acknowledges that he "needs to be seen by an Oral Surgeon," *id.*, and maintains that it's fully capable of providing this service, *see* Response at 14. Lonergan, in sum, has given us no reason to believe that he's in danger

11

of dying from this oral infection, and we will not release him early on the basis of his self-diagnosis. *See Heromin*, 2019 WL 2411311, at *2 (explaining that defendants may not "self-diagnose their own medical conditions" and denying a motion for compassionate release due to "the lack of corroboration from [the defendant's] medical provider").

We acknowledge that the spread of COVID-19 has been pervasive and devastating. It has challenged our institutions, undermined our ability to maintain our economic security, and altered the way we interact. More fundamentally, it goes without saying, the pandemic has resulted in widespread suffering. In the United States alone, more than 76,900,000 people have tested positive for the disease, and over 906,000 Americans have died from it. *See COVID Data Tracker*, CDC (Feb. 9, 2022, 2:03 PM), https://covid.cdc.gov/covid-data-tracker/#cases_totalcases. But "the mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release[.]" *United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020). Additionally, "the BOP Director has not found COVID-19 alone to be a basis for compassionate release." *United States v. Harris*, 2020 WL 1969951, at *2 (M.D. Fla. Apr. 24, 2020) (citing *United States v. Eberthard*, 2020 WL 1450745, at *2 (N.D. Cal. Mar. 25, 2020)). We see no good reason to depart from the BOP's well-reasoned view on this question.

Because Lonergan hasn't shown that his circumstances are either "compelling" or "extraordinary," his Motion must be **DENIED**.

### IV. 18 U.S.C. § 3142(g)

Of course, Lonergan's Motion fails for yet another reason—because he's failed to show that he no longer poses a danger to his community. As the relevant Sentencing Guidelines provision makes clear, the "extraordinary and compelling reasons" test only applies if "the defendant meets the requirements of subdivision (2)"—that is, only if the Defendant demonstrates that he no longer poses a threat to society, as defined by 18 U.S.C. § 3142(g).

12

We're not convinced that Lonergan has met this standard. Lonergan, after all, pled guilty to possessing over 200 images and videos of child pornography. *See* Plea Agreement. During his post-arrest statement, he admitted to transporting these images across international borders—from Mexico to South Florida. *See* PSI at 1, 6–7. And the FBI found (on his iPad) a disconcerting video that appeared to show "Lonergan taping women and young girls in public, focusing on their buttocks and the back of their thighs." *Id.* at 7. These repeated acts of sexual misconduct strongly suggest that, if released, Lonergan would pose a significant danger to his community.

Unsurprisingly, the Eleventh Circuit has affirmed a district court's dangerousness findings in similar circumstances. *See United States v. Swindle*, 2021 WL 4944822 (11th Cir. Oct. 25, 2021). The defendant in *Swindle* had pled guilty to child-pornography offenses. *Id.* at *1. "Law enforcement discovered 75 videos of child pornography on [the defendant's] work computer. Some of those images were of children under the age of 12." *Id.* at *3 n.5. The Eleventh Circuit affirmed the district court's order denying the defendant's motion for compassionate release. *Id.* at *4. In doing so, the court ratified the district court's finding that the defendant posed a danger to the community, saying:

> As the District Court noted, factors to determine whether a person is a "danger to the safety of any other person or the community" specifically include whether the defendant's offense involved "a minor victim." The District Court, after considering that [the defendant] had possessed and exchanged a "prolific" amount of child pornography on his work computer, concluded that the "nature of the crime [the defendant] committed implies a strong risk of recidivism and makes [the defendant] a danger to the community if he is released." Given the harms that flow from child pornography—not only to the child victims but also to society at large—it was by no means an abuse of discretion for the District Court to conclude that releasing [the defendant] might pose a danger to the safety of another person or to the community.

*Id.* (cleaned up). We reach the same result here. *See also, e.g.*, *United States v. Murray*, 2021 WL 6336478, at *4 (M.D. Fla. Jan. 22, 2021) (Conway, J.) (concluding that a defendant convicted of transporting child pornography "remains a danger to the community" and denying his motion for compassionate release).

13

### V. Home Confinement

In the alternative, Lonergan seeks placement in "modified home confinement for the duration of the original imposed sentence," *see* Motion at 27—a request the Government likewise opposes, *see* Response at 5. We have no authority to direct the BOP to transfer a prisoner to home confinement. As the Eleventh Circuit has held, "[i]t is undisputed that the authority to place a prisoner in home confinement rests solely with the BOP rather than the judiciary. And while federal law permits district courts to make the type of recommendation [the defendant] requested, any such recommendation would have been non-binding." *United States v. Groover*, 844 F. App'x 185, 189 (11th Cir. 2021). We thus cannot grant Lonergan the relief he seeks.

Of course, we could achieve the same result by simply reducing Lonergan's sentence to time-served and then "impos[ing] a term of supervised release equal to the unserved time and order, as a condition of that supervised release, that the defendant be confined to his home." *United States v. Spencer*, 2020 WL 5498932, at *2 (6th Cir. Sept. 2, 2020); *see also United States v. Israel*, 2020 WL 3893987, at *9 (S.D. Fla. July 10, 2020) ("Although the Court does not have the authority to order a prisoner's release to home confinement, the Court does have the authority to reduce a defendant's sentence to time-served, impose a term of supervised release, and order home confinement as a condition of supervised release."). To do this, though, we'd have to find that Lonergan has carried his burden of showing that he's entitled to that reduction—a finding that, for the reasons set out above, we refuse to make. *Cf. United States v. Hylander*, 2020 WL 1915950, at *3 (S.D. Fla. Apr. 20, 2020) (Bloom, J.) ("Defendant [who pled to child pornography crimes] proposes to be released to the home with his wife and brother-in-law, which is precisely the location in which the offense for which he was convicted was committed, and presents a concern that Defendant will reoffend. As such, the Court finds that Defendant's release to home confinement would pose a danger to the community.").

*\*\*\**

After a careful review of the parties' filings, the record, and the governing law, the Court hereby **ORDERS and ADJUDGES** that Lonergan's Motion for Compassionate Release [ECF No. 80] is **DENIED**.

**DONE AND ORDERED** in Fort Lauderdale, Florida, this 9th day of February 2022.

_____
**ROY K. ALTMAN**
**UNITED STATES DISTRICT JUDGE**

cc: counsel of record